1  THOMAS P. O'BRIEN
   United States Attorney
2  LEON W. WEIDMAN
   Assistant United States Attorney
3  Chief, Civil Division
   GARY PLESSMAN
4  Assistant United States Attorney
   Chief, Civil Fraud Section
5  LISA A. PALOMBO
   Assistant United States Attorney
6  California State Bar No. 169119
        Room 7516, Federal Building
7       300 North Los Angeles Street
        Los Angeles, California  90012
8       Telephone: (213) 894-4042
        Facsimile: (213) 894-2380
9       email: lisa.palombo@usdoj.gov
   Attorneys for Plaintiff
10 United States of America

11

12              UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14

15                    CV08-05720 DSF (MANx)

16 UNITED STATES OF AMERICA,        )  NO.
                                    )
17        Plaintiff,                )  UNITED STATES' COMPLAINT AND
                                    )  DEMAND FOR JURY TRIAL
18        v.                        )
                                    )
19 THE BOEING COMPANY,              )
                                    )
20                                  )
          Defendant.                )
21 _____)

22

23      Plaintiff United States of America, through its attorneys,

24 alleges as follows:

25              I.   JURISDICTION AND VENUE

26      1.   This is an action for damages and civil penalties arising

27 from false claims and statements made by defendant The Boeing

28 Company ("Boeing") to the United States in violation of the False

1  Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"). This Court has subject

2  matter jurisdiction pursuant to 28 U.S.C. § 1345 and 31 U.S.C.

3  § 3730(a). This Court has personal jurisdiction over Boeing

4  pursuant to 31 U.S.C. § 3732(a) because Boeing is located and

5  transacts business in this District.

6       2.   Venue is proper in this District under 31 U.S.C. § 3732

7  and 28 U.S.C. § 1391(b) because Boeing is located and transacts

8  business in this District.

9                    II.   PARTIES

10      3.   Plaintiff is the United States of America, suing on behalf

11  of the United States Air Force.

12      4.   Defendant Boeing is a Delaware corporation with

13  headquarters in Chicago, Illinois, and is an aerospace and defense

14  firm with offices and business addresses in this District.

15      5.   On or about December 6, 1996, Boeing acquired Rockwell

16  International Inc.'s aerospace and defense units, which became a

17  wholly-owned subsidiary of Boeing called Boeing North American,

18  Inc. ("BNA"). BNA was headquartered in or near Seal Beach,

19  California, and performed some of its operations in Palmdale,

20  California, in part through its North American Aircraft Division.

21  On or about December 31, 1999, BNA was merged into and otherwise

22  became a part of Boeing, and Boeing thereby assumed BNA's

23  outstanding liabilities, including BNA's liability to the United

24  States for the conduct described below.

25                    III.   FCA VIOLATIONS

26  A.   <u>Introduction</u>

27      6.   In its proposal for the Towed Decoy System ("TDS") Lots 1-

28                              2

3 Contract, which was a contract to supply the Air Force with decoy kits for the B-1 bomber, Boeing supplied the Government with cost and pricing data that was false and incomplete in two respects. First, Boeing's proposal included inflated cost estimates for supplying certain sheet metal and other machined parts for the decoy kits.  The costs were inflated because they were based on the proposition that Boeing itself would manufacture the parts, but in truth Boeing intended to buy many of the parts, and components of parts, from suppliers, and to offload to subcontractors many of the manufacturing steps required to make the parts, at a substantial cost savings.  Second, Boeing's proposal failed to disclose that Boeing already had been offloading to subcontractors many of the manufacturing steps required to make the parts, or nearly identical parts, on other contracts, and as a result had achieved significant cost savings on those contracts.

7.   If the Air Force had known that Boeing's proposal was false and incomplete in the respects described above, the Air Force would have negotiated a substantially lower price for the contract. Boeing employees warned Boeing that its cost and pricing data was false and incomplete in these respects, but Boeing managers ignored the warnings and refused to make the corrections and additions needed to make the data accurate, complete, and current.  As a result, Boeing knowingly submitted invoices to the Air Force for inflated amounts it was not entitled to receive, in violation of the False Claims Act, 31 U.S.C. § 3729 et seq. and the common law. The United States sustained damages of at least $7.5 million as a consequence of these violations.

**B.   CMUP and the TDS Project**

8.   In the mid 1990s the Air Force decided to modify its B-1 bomber force so that the aircraft could carry and deliver conventional munitions instead of nuclear bombs.  This program, known as the Conventional Munitions Upgrade Program ("CMUP"), involved numerous projects and dozens of contracts between the Air Force and the prime contractor.  Rockwell International, Inc. initially was the prime contractor for the CMUP, and Boeing became the prime contractor when it acquired Rockwell's aerospace and defense units in approximately December 1996.

9.   One of the CMUP projects called for the production of a system for deploying decoys that could be towed behind B-1 aircraft, and was known as the Towed Decoy System (the "TDS Project").  The TDS Project required Boeing to deliver the decoy systems in "kits" that would later be installed on B-1 aircraft, one kit for each converted bomber.

10.   The TDS Project called for phased production under three different contracts, each of which was a sole source, negotiated contract:

a.   The first TDS Project contract, contract number F33657-95-C-2008, included three phases.  The first phase, known as Engineering and Manufacturing Development, was a secret project (since declassified).  The second phase, known as Kit Proof, called for the manufacture and delivery of a single prototype TDS kit. The third phase, known as Low Rate Initial Production ("LRIP"), called for delivery of seven additional TDS kits.

4

    b.  The second contract, contract number F33657-98-C-2000, known as TDS Production Contract, Lots 1 through 3 (hereinafter "TDS Lots 1-3 Contract"), initially required Boeing to supply 53 additional TDS kits.  By a modification to the contract, the number of kits called for by the contract was later increased to 57.

    c.  The third contract, contract number F33657-00-C-0047, known as TDS Production Contract Lot 4, required Boeing to supply an additional 13 TDS kits.

**C.  The TDS Lots 1-3 Contract**

    11.  The TDS Lots 1-3 Contract, entered into May 28, 1998, was a firm fixed price contract offered solely to Boeing.  It required Boeing to supply the Air Force with a minimum number of kits (Lot 1), and included two options, one for Lot 2, ultimately exercised on November 19, 1998, and one for Lot 3, ultimately exercised on November 30, 1999.  As a condition of entering into this contract, because there was no competition to help ensure that the contract prices would be reasonable, the Government required Boeing to disclose to the Air Force's contract negotiators all facts that a prudent buyer and seller would reasonably expect to affect price negotiations, and to certify that the information submitted was complete, accurate and current.

    12.  On February 17, 1998, Boeing submitted to the Air Force its contract proposal for the TDS Lots 1-3 Contract, comprised of a cost proposal and a technical proposal.  Boeing's proposal initially set forth a proposed price for all three lots of $34,562,393.  On April 1, 1998, Boeing revised this proposed price

1  upward to $35,481,220.  On May 27, 1998, Boeing signed a formal
2  contract offer.  The United States formally accepted the offer in
3  writing and agreed to the contract price the next day, May 28,
4  1998.  The initial agreed contract price was $32,750,000 for 53 TDS
5  kits, but the price was later increased to $35,826,378 for 57 TDS
6  kits.  The initial negotiated price included an anticipated profit
7  to Boeing of 13.8%.  The contract was expected to take
8  approximately four years to complete, with performance lasting
9  through at least mid-2002.
10      13.  Boeing's certified cost proposal estimated that the 53
11  TDS kits would require approximately 132,996 fabrication and
12  assembly direct labor hours to manufacture.  Boeing later revised
13  these numbers upwards to approximately 139,059 fabrication and
14  assembly direct labor hours for 57 TDS kits.
15  **C.  Boeing's Make-Buy Scheme**
16      14.  Pursuant to the Truth in Negotiations Act, 10 U.S.C.
17  Section 2306a ("TINA"), and the Federal Acquisition Regulation
18  ("FAR"), 48 C.F.R. Section 15.403-5, Boeing was required to submit
19  to the Air Force with its contract proposal certified cost or
20  pricing data for use in negotiations for the TDS Lots 1-3 Contract.
21  The cost or pricing data Boeing submitted to the Air Force
22  consisted of a variety of written material, including a
23  manufacturing plan.  In that plan, Boeing represented that it would
24  manufacture the TDS kits at a Boeing facility in Palmdale,
25  California called the Palmdale Manufacturing Center, also known as
26  Palmdale Site 9.  Palmdale Site 9 contained machinery and equipment
27  that Boeing historically had used to make machined parts on a
28                                    6

1   variety of CMUP contracts.  Boeing's proposal represented that it

2   would perform the manufacturing work, including fabrication and

3   assembly, required to make approximately 50 of these types of

4   parts, at Palmdale Site 9.  Each of these parts was identified by a

5   separate part number, and collectively they are hereinafter

6   referred to as the "Make Parts".

7       15.  Boeing's representation in its proposal that it would

8   manufacture the Make Parts at Site 9 was false.  In truth,

9   unbeknownst to the Air Force team that negotiated the Lots 1-3

10  Contract, Boeing intended to close Site 9 before the TDS Project

11  was completed, to purchase components of the Make Parts, from

12  suppliers and to offload to subcontractors many of the

13  manufacturing steps required to build the Make Parts, at a

14  significant cost savings.  Boeing therefore knew that the

15  fabrication and assembly direct labor hours it proposed (initially

16  132,996, later 139,059), and the estimated costs of those labor

17  hours set forth in the proposal, were inflated and false.

18      16.  Les Lackman, the Vice President of Boeing's North

19  American Aircraft Division and General Manager of Boeing's Seal

20  Beach, Palmdale and Anaheim sites, had proposed to Boeing

21  management in the Fall of 1997 to close Palmdale Site 9 by early

22  1999.  This decision, ratified by Boeing's management, was formally

23  and publicly announced on March 20, 1998, as part of a corporate-

24  wide restructuring plan, roughly two months before agreement was

25  reached on the price of the TDS Lots 1-3 Contract.  The closure was

26  consistent with another strategic decision that Boeing's corporate

27  office also publicly announced in March 1998 -- to cease engaging

28                                    7

in the fabrication of "sheet metal parts" and "small, non-strategic machine parts," which are the type of parts that comprise the Make Parts, and instead to purchase these parts from suppliers and subcontractors.

17. As planned, Palmdale Site 9 was substantially closed by early 1999, with more than three years remaining on the TDS Lots 1-3 Contract. By that time, as also planned, Boeing largely had ceased its fabrication of sheet metal and non-strategic machined parts. Boeing ended up performing very little fabrication work on the 50 Make Parts; rather, five parts were not needed, and most of the fabrication work on the other 45 parts was performed by suppliers and subcontractors in accordance with Boeing's March 1998 strategic plan, at a substantial cost savings. Rather than the negotiated 139,059 fabrication and assembly direct labor hours, Boeing incurred only 42,975 fabrication and assembly direct labor hours on the TDS Lots 1-3 Contract. The primary reason for the difference between the number of negotiated labor hours and the number of actually incurred labor hours, and the resulting cost savings, is that most of the fabrication work on the Make Parts was performed by suppliers and subcontractors rather than by Boeing. Largely because of this substantial cost savings, Boeing's actual profit turned out to be 45%, not the 13.8% that the Government and Boeing had negotiated.

18. As set forth in more detail below, Boeing's negotiators for the TDS Lots 1-3 Contract knew, or were reckless or deliberately ignorant in failing to know, that Boeing's cost estimates and the cost and pricing data in Boeing's proposal were

8

false, in that (1) they overstated the amount of fabrication and
assembly direct labor hours, and consequently the costs associated
with those hours, that would be required to perform the contract,
and (2) the proposal falsely represented that Boeing intended to
perform the fabrication work on the Make Parts, rather than have it
performed by suppliers and subcontractors at a significant cost
savings.

19.   The Government, including the Air Force, was not aware of
the falsity of Boeing's proposal, and relied on the truth of
Boeing's costs estimates and cost and pricing data, including the
estimated fabrication and assembly direct labor hours and costs, in
negotiating the price for the TDS Lots 1-3 Contract.   If the
Government had known the true facts, it would not have entered into
the TDS Lots 1-3 Contract with Boeing, and instead would have
insisted on a lower priced contract for Boeing's services.

**D.   Boeing's Failure to Disclose LRIP Cost Data**

20.   In addition to including inflated direct labor hours
estimates in its cost proposal for the TDS Lots 1-3 Contract,
Boeing also failed to provide information regarding its recent
history of offloading to subcontractors on other contracts,
including subcontractors on the LRIP phase of the first TDS Project
contract (hereafter "LRIP"), manufacturing steps on parts that were
the same as, or almost identical to, the Make Parts, at a
significant cost savings.

21.   Boeing's contract proposal for LRIP, dated June 16, 1997,
indicated that Boeing would make certain sheet metal and other
machined parts on LRIP.   These parts (the "LRIP Parts") were the

9

same as, or almost identical to, the 50 or so Make Parts Boeing later proposed to manufacture in its proposal for the TDS Lots 1-3 Contract, as they were used to make the same decoy systems. Notwithstanding the representations in its LRIP proposal, however, Boeing soon thereafter began to offload many of the manufacturing steps required to make LRIP Parts and components of LRIP Parts, employing a cost-cutting approach it had used and continued to use for similar parts on other CMUP contracts.  Boeing accelerated the offloading of LRIP Parts in early December 1997 to achieve significant cost savings.

　　　22.  By May 12, 1998, the date on which Boeing signed the Certificate of Cost or Pricing Data on the TDS Lots 1-3 Contract, Boeing's effort on LRIP was substantially completed.  As of that date, Boeing had offloaded manufacturing steps on approximately 40 LRIP Parts and components, and as a result had incurred significantly lower direct labor hours and costs than the estimates contained in its LRIP proposal.  Notwithstanding its possession of this cost data, Boeing failed to disclose it in its proposal for the TDS Lots 1-3 Contract.

**E.    Boeing's False Proposal and Certification**

　　　23.  The Federal Acquisition Regulation ("FAR"), 48 C.F.R. §15.401 (1998), defines cost or pricing data as, <u>inter alia</u>:

> ". . . all facts that, as of the date of price agreement . . .
> prudent buyers and sellers would reasonably expect to affect
> price negotiations significantly . . . . Cost or pricing data
> are more than historical accounting data; they are all the
> facts that can be reasonably expected to contribute to the

soundness of estimates of future costs and to the validity of
determinations of costs already incurred.  They also include
such factors as: . . . information on changes in production
methods . . .; data supporting projections of business
prospects and objectives and related operations costs; unit-
cost trends such as those associated with labor efficiency;
make-or-buy decisions; estimated resources to attain business
goals; and information on management decisions that could have
a significant bearing on costs."
See also the Truth in Negotiations Act ("TINA"), 10 U.S.C.
§2306a(h)(1).

    24.    The Certificate of Cost or Pricing Data ("Certificate")
that Boeing submitted to the Air Force on May 12, 1998, as required
by TINA and the regulations promulgated thereunder, 10 U.S.C. §
2306a(2) and 48 C.F.R. § 15.406-2, attested that the cost or
pricing data that Boeing submitted to the Air Force in connection
with the negotiations for the TDS Lots 1-3 Contract was "accurate,
complete and current."  As a result of Boeing's failure to disclose
with its proposal either the incurred cost data for CMUP contracts
including LRIP, or its plan to have suppliers and subcontractors
perform much of the fabrication work on the Make Parts, as
described above, the cost or pricing data that Boeing submitted
with its proposal for the TDS Lots 1-3 Contract was not accurate,
complete and current.  As a consequence, the Certificate and
proposal were false.

    25.    The Government, including the Air Force, did not possess
the cost data that showed the significant cost savings Boeing had

11

achieved on LRIP by offloading manufacturing steps on LRIP Parts
and components, and was not otherwise aware of those cost savings
when the TDS Lots 1-3 Contract was negotiated.  If the Air Force
had been aware of that cost data, it would not have entered into
the TDS Lots 1-3 Contract, and instead would have insisted on
paying a lower price for Boeing's services.

26.  As discussed in more detail below, Boeing negotiators
knew, or were reckless or deliberately ignorant in failing to know,
that Boeing's cost proposal was inflated and false, and that
Boeing's certification that Boeing had supplied accurate, complete
and current cost or pricing data was also false.

F.   <u>Negotiations for the TDS Lots 1-3 Contract</u>

27.  In connection with the negotiations for the TDS Lots 1-3
Contract, Boeing and Air Force negotiators met several times from
February through May of 1998 for fact-finding.  During these
meetings the Air Force sought explanations of, among other things,
the basis for Boeing's cost estimates on the TDS Lots 1-3 Contract,
and details regarding Boeing's supposed plan to manufacture the 50
Make Parts for each kit at Site 9.  At these meetings, Air Force
Pricer John Hosek specifically asked Boeing for information
regarding the actual costs that Boeing had incurred in performing
LRIP.  Boeing failed to supply the Government with the information
Mr. Hosek had requested.

28. By April 22, 1998, at the latest, Boeing's management
knew, or was reckless in failing to know, that the proposal for the
TDS Lots 1-3 Contract was false.  Boeing employees involved in the
negotiations for the contract knew that the company had been

offloading on other CMUP contracts, including LRIP, costly
manufacturing steps on parts that were the same as, or nearly
identical to, the Make Parts, at a significant cost savings, and
that Boeing's proposal failed to disclose this fact and the data
that demonstrated it.  Boeing employees involved in the
negotiations also knew that, although Boeing's proposal for the TDS
Lots 1-3 Contract contained assertions that Boeing would
manufacture the Make Parts at Palmdale Site 9, and was priced
accordingly, Boeing actually intended to close Site 9 at the end of
the year, and Boeing's strategic plan called for discontinuation of
the in-house fabrication of parts like the Make Parts.

29.  Some of these Boeing employees discussed their concerns
with each other and with Boeing management.  For example, Gary
Fujikawa was the Boeing pricer assigned to the TDS Lots 1-3
Contract and the individual that signed the Certificate of Cost or
Pricing Data.  At the urging of Mr. Fujikawa, on April 22, 1998, a
memo authored by Boeing Material Pricer Eric Weisman entitled
"Manufacture vs Purchase of Machined Parts" was circulated to
various members of Boeing management.  That memo recounted internal
concerns regarding the proposal:

> "It appears inaccurate to present the estimates [in the
> TDS production proposal] as based on actual hours when in
> fact the parts are being fabricated at vendors . . . . If
> we plan to perform these activities at Palmdale then we
> would also have to disclose the costs of the LRIP
> [offloading] activity as this is current cost and pricing
> data."

13

30.   Boeing's management discussed these concerns and decided that Boeing's Director of Material, Kit Bell, should send Jim Pruett, Boeing's cost account manager for B-1 TDS production, an e-mail to admonish him that he "can't propose parts that we intend to buy as make."  On April 27, 1998, Mr. Bell sent Mr. Pruett an e-mail, but instead of the suggested statement, he asked Pruett to review lists of parts and respond to the following:

> "2.   Even though these parts are on the 'make' list, you
> may off-load through Purchased Labor some or all of the
> work content on these items."

("Purchased labor" is an accounting classification that Boeing used for costs associated with the purchase of services from suppliers and subcontractors.)  Later that day Bell sent a follow-up e-mail to Pruett, asking Pruett to

> "identify any parts on the lists that we are not 'Capable' of
> making based on current resources/capabilities.  These items
> (if any) should not be proposed as Make items and should be
> proposed as Buy/Purchased Parts."

Pruett responded:

> "We can build all the parts that we have bid (or we would not
> have bid it) . . . and purchase labor off-load is a tool we
> use to meet schedule, budget, and unforeseen circumstances."

Notably, the focus of these e-mails is on whether Boeing had the current capability to manufacture the Make Parts -- not on whether Boeing actually intended to make them.

31.   When Mr. Fujikawa signed the Certificate of Cost or Pricing Data on May 12, 1998, he knew about the internal concerns

14

regarding the accuracy of the TDS Lot 1-3 Contract proposal and he understood that the information at issue constituted cost or pricing data to which the Government was entitled.  On May 11, 1998 - the day before he signed the Certificate -  he authored a memo to file, entitled "cover my ass file."  Mr. Fujikawa's memo discusses "the latest configuration change."  The memo confirms that Boeing executives Jim Walcher and Dick Pasco had told Fujikawa that the proposal for the TDS Lots 1-3 Contract would not be revised. Fujikawa had asked Mr. Pasco, Boeing's Program Manager for LRIP, about the "configuration change;" Pasco had confirmed that there was a "configuration change," but nevertheless told Fujikawa that the change "does not impact the agreed to labor hours."  Mr. Fujikawa was puzzled by Pasco's response, because he (Mr. Fujikawa) did not understand how the offloading of Make Parts would not impact proposed labor hours.  Notwithstanding his doubt about the accuracy of Boeing's proposal, Fujikawa signed and submitted the Certificate of Cost or Pricing Data the day after he authored the "cover my ass file" memo, without any disclosure of his concerns to the Government.

32.  Even after the TDS Lots 1-3 Contract was finalized and the contract was in production, Boeing concealed from Air Force negotiators the actual costs and labor hours that Boeing had incurred on LRIP and on the TDS Lots 1-3 Contract.  In approximately March 2000, for example, Boeing and the Air Force began negotiations for TDS Production Contract Lot 4.  In connection with those negotiations, Air Force Pricer John Hosek continued to ask Boeing for the incurred cost data for LRIP and the

1  TDS Lots 1 to 3 Contract, but Boeing still refused to provide it.
2  A Boeing document dated March 29, 2000 states: "Cost History –
3  Hosek will be fighting us to get us to provide him past data.  NO
4  DETAIL MATERIAL $ TO BE GIVEN TO HOSEK."

5  **G.**  **Boeing's Fraudulent Inducement Of the Government's Exercise of**
6      **the Lot 3 Option**

7      33.  Ultimately, by November 1999, as a result of the
8  Government's receipt of Boeing's progress payment requests on the
9  TDS Lots 1-3 Contract, which contained information regarding
10 Boeing's costs, the Government knew that Boeing was incurring costs
11 on the contract that were far lower and, therefore, was making
12 profits on the contract that were far higher, than the estimated
13 costs and profit contained in the TDS Lots 1-3 Contract.  Moreover,
14 the Government knew by this time that part of the reason for these
15 lower costs and higher profits was Boeing's offloading of
16 manufacturing steps required to build the Make Parts.

17     34.  Boeing, however, continued to mislead the Government as
18 to the cause of Boeing's supposedly unexpected high profits.
19 Boeing falsely represented to the Government that the lower-than-
20 estimated costs and higher-than-negotiated profits on the TDS Lots
21 1-3 Contract were the result of unforseen events and practices that
22 Boeing had not anticipated at the time the price for the contract
23 was set in May 1998.  As late as August 3, 1999, Boeing falsely
24 represented to the Air Force that Boeing's offloading activities
25 had resulted in "lower than expected" costs.  Boeing thus continued
26 to conceal that, in truth, the outsized profit it had made on the
27 TDS Lots 1-3 Contract was the natural and expected result of the

28

16

false and fraudulent cost or pricing data it had submitted to the
Government in May 1998, and that its undisclosed plan to offload
manufacturing steps on the Make Parts at a substantial cost
savings, in accordance with its practices on LRIP and other CMUP
contracts, had resulted in the negotiation of an excessively high
price for all three Lots of the TDS Lots 1-3 Contract.

35. On November 30, 1999, the Government elected to exercise
the option on Lot 3. At this point, due to Boeing's continuing
misrepresentations and concealment, as described above, Air Force
Contracting Officer Timothy Bateson had no reason to know that
Boeing's low costs and high profits on the TDS Lots 1-3 Contract
had resulted from anything other than business practices and events
that were unexpected and unforseen by Boeing as of the date Boeing
certified its cost proposal for the TDS Lots 1-3 Contract. Mr.
Bateson understood that Boeing's plan to offload manufacturing
steps on the Make Parts had been put into place after May 1998,
that Boeing's low costs and resulting high profits had resulted
from legitimate and prudent business practices and plans, and that
the option price that had been set for Lot 3 preceded these plans.
He thus believed that the original negotiation process for the
option's price had been a fair one, in which the price had been set
based on accurate and complete cost or pricing data. Although Mr.
Bateson was concerned about Boeing's outsized profit on TDS Lots 1
and 2, he did not think that those profits were due to any
violations of law. Moreover, in connection with the Government's
decision to exercise the option on Lot 3, Boeing had informed Mr.

1  Bateson that its per-kit profit on Lot 3 would likely be lower than
2  the profit on Lots 1 and 2.

3      36.  If he had known the true facts, however, Mr. Bateson
4  would not have chosen to have the Government exercise the option on
5  Lot 3.  Instead, he would have caused the Government to issue a new
6  Request For Proposal ("RFP") for Lot 3 to negotiate a new, fair
7  price.

8  H.  __Boeing's False Claims and False Statements__

9      37.  Boeing fraudulently induced the Air Force to enter into
10  the TDS Lot 1-3 Contract by:

11      (1) submitting a proposal that

12          (a) contained inflated and false estimates of fabrication
13          and assembly direct labor hours and the costs associated
14          with those hours,

15          (b) falsely represented that Boeing intended to perform
16          fabrication work on the Make Parts that Boeing did not
17          intend to perform, and

18          (c) failed to disclose that Boeing had been offloading to
19          subcontractors and suppliers on other CMUP contracts,
20          including LRIP, many of the manufacturing steps required
21          to build parts that were the same as, or nearly identical
22          to, the Make Parts, at a much lower price than the price
23          set forth in Boeing's proposal.

24      (2) submitting a Certificate of Cost and Pricing Data that
25      falsely stated that the cost and pricing data Boeing submitted
26      in connection with its proposal was accurate, complete and
27      current.

28

                                    18

38.   Boeing also fraudulently induced the Air Force to exercise the option on Lot 3 of the TDS Lot 1-3 Contract by (1) falsely representing in a letter from W.A. James of Boeing to Air Force Contracting Officer Timothy Bateson, dated August 3, 1999, that the costs incurred on Lots 1 and 2 had been "lower than expected;" and (2) by concealing and failing to disclose that (a) in truth, Boeing had anticipated these lower costs at the time Boeing had submitted its false proposal for the TDS Lots 1-3 Contract and that (b) Boeing's outsized profit had resulted from deceitful price negotiations rather than prudent business practices and unforseen events after the negotiations had concluded.

39.   By virtue of the false and fraudulent representations and omissions described above, the invoices and progress payment requests that Boeing submitted to the Government to obtain payment for its services under the TDS Lot 1-3 Contract were inflated, false, and fraudulent.  Boeing's false and fraudulent statements as alleged herein were material, and the Government would not have paid Boeing's inflated, false and fraudulent invoices and progress payment requests if the Government had known the true facts.

40.   Attachment A identifies 140 false and fraudulent invoices and requests for progress payments that Boeing submitted to the Government for work on the TDS Lots 1-3 Contract.  These invoices and requests for progress payments constitute false claims under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA").  Attachment A sets forth, for each such false claim, the date the claim was received by the Government; the date the Government paid it; the amount of the payment; and the claim type, which specifies the

19

progress payment request, invoice, delivery order, or other demand for payment to which the payment pertains.  The United States paid the claims itemized in Attachment A by electronic funds transfer.

41.  Boeing's contract proposal and Certificate of Cost or Pricing Data constitute false statements to get false claims paid within the meaning of the FCA.

42.  On May 20, 2004, in return for forbearance from suit, Boeing waived any statute of limitations defense that might apply to the claims alleged herein.

## FIRST CLAIM FOR RELIEF

### [False Claims Act--Presenting False or Fraudulent Claims to the United States, 31 U.S.C. § 3729(a)(1)]

43.  Plaintiff incorporates the allegations contained in paragraphs 1 through 42 above.

44.  Boeing presented to the United States for payment or approval the false or fraudulent claims described in paragraph 40 above, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

45.  Plaintiff United States has sustained damages as a result of Boeing's false claims in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### [False Claims Act--Making or Using a False Record or Statement to Get a False or Fraudulent Claim Paid or Approved, 31 U.S.C. § 3729(a)(2)]

46.  Plaintiff incorporates the allegations contained in paragraphs 1 through 42 above.

47.   Boeing made, used, or caused to be made or used, the false records and statements described in paragraph 24, 37 and 38 above to get the false and fraudulent claims for payment described in paragraph 40 above paid or approved by an officer, employee, or member of the Armed Forces of the United States, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

48.   Plaintiff United States has sustained damages as a result of Boeing's false claims, records and statements in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

#### [Conversion]

49.   Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 to 42 above.

50.   The United States has a right to possess the funds that Boeing received as a result of its inflated and false contract proposal and Boeing's failure to provide all of the cost or pricing information in its possession.

51.   Boeing obtained those funds through the wrongful acts described above.

52.   As a result of Boeing's wrongful conversion, the United States has sustained damages in an amount to be determined.

53.   Boeing's conduct was willful, malicious, and in conscious disregard of plaintiff's rights.  Plaintiff, therefore, is entitled to recover punitive damages in an amount sufficient to deter similar conduct in the future.

1

**PRAYER**

2      WHEREFORE, plaintiff United States prays for judgment against

3  defendant The Boeing Company as follows:

4      A.   On the First Claim for Relief, treble the amount of actual

5  damages sustained by the United States, plus such civil penalties

6  as are allowable by law;

7      B.   On the Second Claim for Relief, treble the amount of

8  actual damages sustained by the United States, plus such civil

9  penalties as are allowable by law;

10     C.   On the Third Claim for Relief, the money that Boeing

11 wrongfully converted from the United States, plus interest thereon

12 at the legal rate, and punitive damages sufficient to deter similar

13 conduct in the future;

14     D.   All other relief this Court deems just and proper,

15 including post-judgment interest, attorneys' fees and litigation

16 fees as appropriate, and costs of this action.

17 DATED: September 2, 2008

18                              Respectfully submitted,
                                THOMAS P. O'BRIEN
19                              United States Attorney
                                LEON W. WEIDMAN
20                              Assistant United States Attorney
                                Chief, Civil Division
21                              GARY PLESSMAN
                                Assistant United States Attorney
22                              Chief, Civil Fraud Section

23

24                       By: _____
                                LISA A. PALOMBO
25                              Assistant United States Attorney

26                              Attorneys for Plaintiff
                                United States of America

27

28
                                22

## DEMAND FOR JURY TRIAL

Plaintiff United States of America hereby demands a trial by jury.

DATED: September 2, 2008

Respectfully submitted,
THOMAS P. O'BRIEN
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
GARY PLESSMAN
Assistant United States Attorney
Chief, Civil Fraud Section

By: _____
    LISA A. PALOMBO
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

23

# ATTACHMENT A

**Attachment A**
**Contract F33657-98-C-2000**
**Towed Decoy System**
**Source: Defense Finance and Accounting Service**
**1998-2002**

| Claim | Date Claim Received | Date Claim Paid | Amount of Payment | Claim Type |
|---|---|---|---|---|
| 1 | 8/12/1998 | 09/08/98 | $121,790.00 | Progress Payment 01 |
| 2 | 9/4/1998 | 09/15/98 | $75,312.00 | Progress Payment 02 |
| 3 | 10/8/1998 | 10/28/98 | $182,604.00 | Progress Payment 03 |
| 4 | 11/4/1998 | 11/10/98 | $225,513.00 | Progress Payment 04 |
| 5 | 12/3/1998 | 12/16/98 | $427,213.00 | Progress Payment 05 |
| 6 | 1/25/1999 | 02/02/99 | $235,363.00 | Progress Payment 06 |
| 7 | 1/19/1999 | | | Delivery Order ECM0006 |
| 8 | 1/19/1999 | | | Delivery Order ECM0008 |
| 9 | 1/19/1999 | | | Delivery Order ECM0011 |
| 10 | 1/19/1999 | | | Delivery Order ECM0012 |
| 11 | 1/19/1999 | 02/17/99 | $7,341.00 | Delivery Order ECM0013 |
| 12 | 1/19/1999 | | | Delivery Order ECM0009 |
| 13 | 1/19/1999 | 02/18/99 | $4,282.25 | Delivery Order ECM0010 |
| 14 | 4/19/1999 | 04/27/99 | $972,115.00 | Progress Payment 07 |
| 15 | 6/2/1999 | 06/29/99 | $839,269.00 | Progress Payment 08 |
| 16 | 7/1/1999 | 07/14/99 | $469,563.00 | Progress Payment 09 |
| 17 | 7/14/1999 | | | Delivery Order CAR0001 |
| 18 | 7/14/1999 | | | Delivery Order CAR0005 |
| 19 | 7/14/1999 | | | Delivery Order CAR 0006 |
| 20 | 7/14/1999 | | | Delivery Order CAR 0007 |
| 21 | 7/14/1999 | 08/05/99 | $649,408.50 | Delivery Order CAR 0008 |
| 22 | 7/29/1999 | 08/06/99 | $845,268.00 | Progress Payment 10 |
| 23 | 7/21/1999 | 08/13/99 | 7,541.00 | Contract Payment ACO2066 |
| 24 | 8/5/1999 | | | Delivery Order CAR0009 |
| 25 | 8/5/1999 | 08/30/99 | $337,840.87 | Delivery Order CAR0010 |
| 26 | 9/12/1999 | 09/23/99 | $742,994.00 | Progress Payment 11 |
| 27 | 9/16/1999 | 10/12/99 | $181,087.25 | Delivery Order CAR0011 |
| 28 | 10/1/1999 | 10/14/99 | $79,853.00 | Progress Payment 12 |
| 29 | 10/15/1999 | 11/08/99 | $27,659.75 | Contract Payment MOD2275 |
| 30 | 11/4/1999 | 11/19/99 | $659,300.00 | Progress Payment 13 |
| 31 | 11/22/1999 | | | Delivery Order CAR0015 |

24

**Attachment A**
**Contract F33657-98-C-2000**
**Towed Decoy System**
**Source: Defense Finance and Accounting Service**
**1998-2002**

| Claim | Date Claim Received | Date Claim Paid | Amount of Payment | Claim Type |
|---|---|---|---|---|
| 32 | 11/22/1999 | 11/30/99 | $362,174.50 | Delivery Order CAR0016 |
| 33 | 12/7/1999 | 12/17/99 | $612,702.00 | Progress Payment 14 |
| 34 | 12/20/1999 | 12/28/99 | $181,087.25 | Delivery Order CAR0017 |
| 35 | 12/20/1999 | 01/12/00 | $181,087.25 | Delivery Order CAR0018 |
| 36 | 2/22/2000 | 03/16/00 | $7,944.00 | Delivery Order CAR0024 |
| 37 | 2/22/2000 | 03/27/00 | $639,736.00 | Progress Payment 15 |
| 38 | 3/5/2000 | | | Delivery Order CAR0025 |
| 39 | 3/6/2000 | | | Delivery Order CAR0026 |
| 40 | 3/7/2000 | | | Delivery Order CAR0028 |
| 41 | 3/8/2000 | | | Delivery Order CAR0029 |
| 42 | 3/9/2000 | 03/28/00 | $39,720.00 | Delivery Order CAR0030 |
| 43 | 2/16/2000 | 04/06/00 | $1,073,324.00 | Progress Payment 16 |
| 44 | 4/9/2000 | 04/28/00 | $7,944.00 | Delivery Order CAR0027 |
| 45 | 4/12/2000 | | | Delivery Order CAR0022 |
| 46 | 4/12/2000 | | | Delivery Order CAR0023 |
| 47 | 4/12/2000 | | | Delivery Order RTC0001 |
| 48 | 4/12/2000 | 05/05/00 | $380,046.50 | Delivery Order RTC0002 |
| 49 | 5/4/2000 | 06/08/00 | $1,606,088.00 | Progress Payment 17 |
| 50 | 6/5/2000 | | | Delivery Order BAT0006 |
| 51 | 6/5/2000 | | | Delivery Order BAT0007 |
| 52 | 6/5/2000 | | | Delivery Order BAT0008 |
| 53 | 6/5/2000 | | | Delivery Order BAT0009 |
| 54 | 6/5/2000 | | | Delivery Order CAR0013 |
| 55 | 6/5/2000 | | | Delivery Order CAR0014 |
| 56 | 6/5/2000 | | | Delivery Order CAR0019 |
| 57 | 6/5/2000 | 06/28/00 | $12,925.00 | Delivery Order CAR0034 |
| 58 | 6/12/2000 | 06/30/00 | $743,614.00 | Progress Payment 18 |
| 59 | 6/19/2000 | | | Delivery Order BAT0001 |
| 60 | 6/19/2000 | | | Delivery Order BAT0002 |
| 61 | 6/19/2000 | | | Delivery Order BAT0003 |
| 62 | 6/19/2000 | | | Delivery Order BAT0004 |

25

**Attachment A**
**Contract F33657-98-C-2000**
**Towed Decoy System**
**Source: Defense Finance and Accounting Service**
**1998-2002**

| Claim | Date Claim Received | Date Claim Paid | Amount of Payment | Claim Type |
|---|---|---|---|---|
| 63 | 6/19/2000 | | | Delivery Order BAT0005 |
| 64 | 6/19/2000 | | | Delivery Order CAR0021 |
| 65 | 6/19/2000 | 07/12/00 | $8,612.75 | Delivery Order CAR0022 |
| 66 | 6/20/2000 | | | Delivery Order RTC0002 |
| 67 | 6/20/2000 | | | Delivery Order RTC0003 |
| 68 | 6/20/2000 | | | Delivery Order RTC0004 |
| 69 | 6/20/2000 | | | Delivery Order RTC0005 |
| 70 | 6/20/2000 | | | Delivery Order RTC0006 |
| 71 | 6/20/2000 | | | Delivery Order SCB0001 |
| 72 | 6/20/2000 | 07/13/00 | $62,140.00 | Delivery Order SCB0002 |
| 73 | 6/22/2000 | | | Delivery Order CAR0002 |
| 74 | 6/22/2000 | | | Delivery Order CAR0003 |
| 75 | 7/12/2000 | 07/17/00 | $539,113.00 | Progress Payment 19 |
| 76 | 8/17/2000 | 08/22/00 | $529,093.00 | Progress Payment 20 |
| 77 | 9/11/2000 | 09/14/00 | $799,441.00 | Progress Payment 21 |
| 78 | 9/12/2000 | | | Delivery Order CAR0012 |
| 79 | 9/12/2000 | 10/05/00 | $6,695.00 | Delivery Order CAR0031 |
| 80 | 9/15/2000 | | | Delivery Order CAR0040 |
| 81 | 9/15/2000 | | | Delivery Order CAR0041 |
| 82 | 9/15/2000 | 10/10/00 | $301,187.50 | Delivery Order CAR0042 |
| 83 | 9/22/2000 | 10/16/00 | $301,187.50 | Delivery Order CAR0033 |
| 84 | 9/22/2000 | | | Delivery Order CAR0038 |
| 85 | 9/22/2000 | 10/17/00 | $1,206,062.50 | Progress Payment 22 |
| 86 | 9/25/2000 | 10/18/00 | $3,393.75 | Delivery Order CAR0004 |
| 87 | 10/10/2000 | 11/02/00 | $282,283.00 | Delivery Order CAR0039 |
| 88 | 10/23/2000 | 11/15/00 | $301,188.25 | Delivery Order CAR0043 |
| 89 | 11/8/2000 | 11/24/00 | $767,434.00 | Progress Payment 23 |
| 90 | 11/14/2000 | 12/07/00 | $15,654.00 | Contract Payment MODA023 |
| 91 | 11/22/2000 | 12/12/00 | $463,554.50 | Delivery Order CAR0035 |
| 92 | 11/22/2000 | | | Delivery Order CAR0036 |
| 93 | 11/22/2000 | | | Delivery Order CAR0037 |

26

**Attachment A**
**Contract F33657-98-C-2000**
**Towed Decoy System**
**Source: Defense Finance and Accounting Service**
**1998-2002**

| Claim | Date Claim Received | Date Claim Paid | Amount of Payment | Claim Type |
|---|---|---|---|---|
| 94 | 12/11/2000 | 12/15/00 | $817,169.50 | Progress Payment 24 |
| 95 | 1/10/2001 | 01/17/01 | $295,267.00 | Progress Payment 25 |
| 96 | 12/21/2000 | 01/18/01 | $150,594.50 | Delivery Order CAR0044 |
| 97 | 1/25/2001 | 02/20/01 | $242,913.00 | Delivery Order CAR0046 |
| 98 | 2/6/2001 | 02/22/01 | $597,761.00 | Progress Payment 26 |
| 99 | 3/9/2001 | 03/14/01 | $425,351.00 | Progress Payment 27 |
| 100 | 4/10/2001 | 04/12/01 | $468,935.00 | Progress Payment 28 |
| 101 | 4/19/2001 | 05/14/01 | $181,087.25 | Delivery Order CAR0032 |
| 102 | 5/8/2001 | | | Delivery Order CAR0051 |
| 103 | 5/8/2001 | 05/17/01 | $603,770.75 | Delivery Order CAR0052 |
| 104 | 5/7/2001 | 05/21/01 | $321,742.00 | Progress Payment 29 |
| 105 | 5/9/2001 | 05/22/01 | $435,743.89 | Delivery Order CAR0045 |
| 106 | 5/8/2001 | 05/31/01 | $141,141.50 | Delivery Order CAR0053 |
| 107 | 6/6/2001 | 06/12/01 | $220,686.00 | Progress Payment 30 |
| 108 | 6/5/2001 | 06/28/01 | $447,267.11 | Delivery Order CAR0049 |
| 109 | 6/12/2001 | 07/05/01 | $358,932.88 | Delivery Order CAR0057 |
| 110 | 7/16/2001 | 07/26/01 | $261,759.00 | Progress Payment 31 |
| 111 | 7/11/2001 | | | Delivery Order CAR0056 |
| 112 | 7/11/2001 | | | Delivery Order CAR0059 |
| 113 | 7/11/2001 | | | Delivery Order CAR0060 |
| 114 | 7/11/2001 | | | Delivery Order CAR0050 |
| 115 | 7/11/2001 | | | Delivery Order CAR0054 |
| 116 | 7/11/2001 | 08/03/01 | $2,827,830.00 | Delivery Order CAR0055 |
| 117 | 7/12/2001 | 08/06/01 | $602,375.00 | Delivery Order CAR0047 |
| 118 | 7/12/2001 | 08/07/01 | $423,766.94 | Delivery Order CAR0048 |
| 119 | 8/17/2001 | 08/21/01 | $484,767.00 | Progress Payment 32 |
| 120 | 8/6/2001 | 08/30/01 | $18,904.50 | Contract Payment ADD0039 |
| 121 | 9/7/2001 | 09/11/01 | $72,564.00 | Progress Payment 33 |
| 122 | 9/11/2001 | 09/20/01 | $171,339.48 | Delivery Order CAR0062 |
| 123 | 9/11/2001 | 10/04/01 | $358,971.20 | Delivery Order CAR0061 |
| 124 | 10/18/2001 | 10/22/01 | $54,495.00 | Progress Payment 34 |

27

**Attachment A**
**Contract F33657-98-C-2000**
**Towed Decoy System**
**Source: Defense Finance and Accounting Service**
**1998-2002**

| Claim | Date Claim Received | Date Claim Paid | Amount of Payment | Claim Type |
|---|---|---|---|---|
| 125 | 10/4/2001 | | | Delivery Order CAR0063 |
| 126 | 10/4/2001 | 10/27/01 | $1,129,132.00 | Delivery Order CAR0064 |
| 127 | 11/5/2001 | 11/13/01 | $564,566.00 | Delivery Order CAR0066 |
| 128 | 11/15/2001 | 11/19/01 | $177,528.00 | Progress Payment 35 |
| 129 | 11/5/2001 | 11/28/01 | $510,071.00 | Delivery Order CAR0065 |
| 130 | 1/9/2002 | 01/17/02 | $300,342.00 | Progress Payment 36 |
| 131 | 1/21/2002 | 02/13/02 | $141,141.50 | Delivery Order CAR0068 |
| 132 | 4/7/2002 | 04/19/02 | $564,566.00 | Delivery Order CAR0076 |
| 133 | 4/17/2002 | | | Delivery Order CAR0079 |
| 134 | 4/17/2002 | 04/25/02 | $1,129,132.00 | Delivery Order CAR0080 |
| 135 | 4/7/2002 | 05/01/02 | $510,120.50 | Delivery Order CAR0077 |
| 136 | 4/16/2002 | 05/09/02 | $105,570.00 | Contract Payment ACO4475 |
| 137 | 4/17/2002 | 05/10/02 | $27,609.00 | Delivery Order ECM0007 |
| 138 | 7/31/2002 | 08/23/02 | $1,250.00 | Delivery Order ECM0014 |
| 139 | 8/7/2002 | | | Delivery Order ADD0069 |
| 140 | 8/7/2002 | 09/09/02 | $1,129,132.00 | Delivery Order ADD0070 |
| | | | $35,802,044.37 | |
| | | | $24,333.63 | Final Contract Adjustment |
| | | | $35,826,378.00 | Total Payments |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV08- 5720 DSF (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

COPY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>PLAINTIFF(S)<br><br>v.<br><br>THE BOEING COMPANY,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV08-05720 DSF (MANx)<br><br><br>**SUMMONS** |
| --- | --- |

TO:   DEFENDANT(S):  THE BOEING COMPANY

    A lawsuit has been filed against you.

    Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Lisa A. Palombo, AUSA _____ , whose address is  U.S. Attorney's Office, 300 N. Los Angeles St., Room 7516, Los Angeles, CA 90012 ____ .  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                                      Clerk, U.S. District Court

Dated:  **SEP - 2** 2008 _____

By: _____ **LA'REE HORN**
                    Deputy Clerk

                    (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1192

---

CV-01A (12/07)                                   **SUMMONS**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | THE BOEING COMPANY |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| THOMAS P. O'BRIEN, U.S. Attorney; LISA A. PALOMBO, AUSA<br>300 N. Los Angeles St., Room 7516, Federal Building<br>Los Angeles, CA 90012; Phn: 213-894-4042; Fax: 213-894-2380 | Glenn E. Monroe, Esq.<br>PERKINS COIE<br>1620 26th Street, 6th Floor<br>Santa Monica, CA  90404-4013; Phn: 310-788-3273; Fax: 310-788-3399 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No      ☑ **MONEY DEMANDED IN COMPLAINT: $** 24.3 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
False Claims Act, 31 U.S.C.  § 3929 et seq., presenting false claims to the United States

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **FORFEITURE / PENALTY** | | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | | ☐ 610 Agriculture | | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | | **SOCIAL SECURITY** |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |

CV08-05720

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
<u>Note: In land condemnation cases, use the location of the tract of land involved</u>

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Tara Delconte_  Date _Sept. 2, 2008_

**Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |